IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

COY BROWN, individually and as TRUSTEE
OF THE C & B BROWN TRUST and the
WELDON COY BROWN TRUST,

      Plaintiff,

vs.                                                                                       Civ. No. 19-736 JCH/JHR

CENTENNIAL PRECIOUS METALS, INC. a
Colorado Corporation; USAGOLD, INC., a
Colorado Corporation; MICHAEL KOSARES,
An individual; and DOES 1-20, inclusive,

      Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendants' Motion to Dismiss* [Doc. 2], in which they argue that Plaintiff's claims are untimely. Defendants also contend that they owed no fiduciary duty to Plaintiff and that his tort claims are barred by the economic loss rule. Plaintiff filed a response [Doc. 12], and Defendants filed a reply [Doc. 16]. After reviewing the parties' arguments, the Court concludes that the motion to dismiss should be granted.

## LEGAL STANDARD

"A pleading is required to contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(2)). This Court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the" plaintiff. *Id.* (quoting *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013)). The court must then "determine whether the plaintiff has provided 'enough facts to state a claim to relief that is

plausible on its face.'" *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1247 (10th Cir. 2016) (citation omitted) (quoting *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014)).

"In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to 'set forth a prima facie case for each element.'" *Id.* (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1192–93 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Id.* at 1214 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, a "claim is facially plausible if the plaintiff has pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *George*, 833 F.3d at 1247 (quoting *Hogan*, 762 F.3d at 1104, which in turn quotes *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

However, "when legal conclusions are involved in the complaint[,] 'the tenet that' " we accept the allegations as true "is inapplicable to [those] conclusions." *Shields*, 744 F.3d at 640 (second alteration in original) (citation omitted).

## PROCEDURAL AND FACTUAL BACKGROUND

On July 11, 2019, Plaintiff Coy Brown ("Brown") filed his Complaint for Fraud, Breach of Contract, Negligent Misrepresentation, and Breach of Fiduciary Duty ("Complaint") [Doc. 1-1] in the Second Judicial District Court, Bernalillo County, New Mexico. He asserts claims against Centennial Precious Metals, Inc. ("Centennial"), USAGOLD, Inc. ("USAGOLD"), and Michael Kosares (collectively, "Defendants"). On August 12, 2019, Defendants filed their Notice of

Removal [Doc. 1] in this Court, asserting that this federal district court has diversity jurisdiction over the case.

The pertinent facts alleged in the Complaint are as follows. USAGOLD and Centennial Precious Metals buy and sell precious metals, coins, and gold bullion, and they also provide investment advice to their clients. Doc. 1-1, ¶ 2-3. Defendant Michael Kosares is the founder and executive director of USAG, officer and director of Centennial, and author of the book <u>The ABC's of Gold Investing: How to Protect and Build Your Wealth with Gold</u>, which USAG claims has "helped thousands of investors learn the basics of gold ownership." Id. at ¶ 5.

In approximately 1998, Brown began looking for someone to guide and educate him in investing. Id. at ¶ 13. He contacted Defendants and began dealing directly with Kosares, who advised Brown to read his book. Id. at ¶ 14. Brown did so, and afterwards he informed Kosares that he wanted to invest but that he (Brown) was inexperienced and would be entirely at Defendants' mercy and ethics. Id. at ¶ 14-15. In response, Kosares told Brown that he could rely on USAG, which had a "stellar reputation and the requisite experience and expertise to provide Plaintiff with the required guidance." Id. at ¶ 16. Brown decided to invest with Defendants, informing them that his goal was to acquire as many ounces of gold as possible, though he did not know or care about what type of coins he purchased; rather, he wanted to "put away gold for retirement." ¶ 16-17.

Defendants proposed to buy foreign bullion coins for Brown that would have very little margin cost, which is the cost over and above the "spot price" of gold. The "spot price," in turn, is the price on a particular day and time at which gold, as a metal, sells per ounce on the world market. Id. at ¶ 18. Before Plaintiff made his first purchase, Defendants told him that for him they would purchase "common foreign gold coins" for between 3-5% over spot price, which they would in

turn sell to Brown for a commission of another 3-5% over spot price. Id. This would result in Brown purchasing gold from Defendants at a rate of 6-10% above spot price. Id. Brown accepted these terms. Id. Defendants assured Brown that they would be completely honest with him and sell him the coins at the agreed 6-10% markup. Id. at ¶ 19. Brown began purchasing gold coins from Defendants.

The invoices sent by Defendants to Brown set forth how many coins Brown had purchased and at what price. The invoices contained no information regarding the relevant spot price or the amount of the markup Brown had paid. Id. at ¶ 20. Rather, the invoices Brown received from Defendants stated how many coins he had purchased and at what price.

After the first few purchases, Defendants told Brown that if he invested in pre-1933 U.S. gold coins graded by an independent grading company, he would pay a markup of 25%. However, these "graded coins" would increase in value so much that when they reached 45% over spot price, Defendants would sell the coins for him and reinvest the proceeds in common bullion coins. Id. at ¶ 21. Defendants portrayed this as a way of furthering Brown's goal of acquiring as many ounces of common gold as possible. Id. Defendants also told Brown they could carry out trades for him, purchasing and exchanging common foreign gold for graded coins, and vice versa. Id.

Brown and Defendants engaged in dozens of transactions between 1998 and 2013. Id. at ¶ 22. The value of gold had risen substantially during that time; however, Defendants had never sent Brown any documentation to show the premiums he actually paid. Id.

In April of 2016, Defendants asked Brown whether he wanted to sell them two varieties of common foreign bullion coins that they had sold to him in 2009. Id. at ¶ 23. In response to this inquiry, Brown "researched the price he paid" for the coins and learned for the first time that the premiums he had paid ranged from 25% to 29%. Id. The complaint does not allege facts explaining

4

the research Brown did or how he reached this conclusion. Brown raised the issue with Defendants. On May 20, 2016, Kosares called Brown and said that Defendants had made a mistake on that 2009 transaction and owed Brown $35,000.00 Id. at ¶ 24. On May 24, 2016, Brown wrote to Kosares, asking for additional information about the 2009 transaction and Kosares' suggested solution for the mistake. Id. at ¶ 25. The following day, Kosares emailed Brown, saying that Defendants had overcharged Brown in the 2009 transaction by $35 per coin for 1,000 coins, resulting in a refund of $35,000 due to Brown. Id. at ¶ 26. In the email, Kosares stated that Defendants would agree to either transfer 156 common foreign bullion gold coins to Brown or write him a check for $35,000. Id.

Brown did not accept the refund and decided to look at other transactions with Defendants to determine if any others were incorrect. Id. at ¶ 27. Brown spent the following two months "investigating" his past gold purchases from Defendants. Id. His complaint does not allege the nature of his investigation. As of August 2, 2016, Brown discovered that he had been charged premiums well over 6-10% on the majority of the common foreign gold purchases and over 25% for the graded U.S. coins. Id. Some of the premiums were 200% or more, which was contrary to Defendants' representations regarding the premiums that would be charged. Id.

Brown's complaint contains four causes of action. First, Brown asserts a claim for fraud, claiming that between 1998 and 2013, Defendants intentionally induced Brown into purchasing gold coins by deceiving him into believing that he had paid 6-10% over spot price for foreign bullion coins and 25% over spot price for U.S. graded coins—the premium parameters they had agreed upon. Id. at ¶ 29. Second, he asserts a claim for breach of oral contract on the grounds that Defendants breached their oral agreement with Brown regarding the proper rate of premiums. Third, Brown asserts a claim for negligent misrepresentation, asserting that Defendants negligently

5

made untrue statements regarding the premiums they would charge him. Fourth, Brown makes a claim for breach of fiduciary duty, asserting that as investment counselors in whom Brown reposed trust and confidence, Defendants owed him a fiduciary duty to act in his best interests and with full disclosure of all relevant facts.

## DISCUSSION

As grounds for their motion to dismiss, Defendants argue that (1) all of Brown's claims are untimely under the applicable statutes of limitations, (2) no fiduciary relationship existed between the parties, and (3) under the "economic loss rule," Brown cannot sue in tort for the breach of duties that arise solely under a contract. Because the Court concludes that Brown's claims are time-barred, it does not reach Defendants' second and third arguments.

**Statute of Limitations (All Claims)**

The parties agree that as a court exercising diversity jurisdiction, this Court must apply New Mexico law for statute of limitations purposes. They also agree that the applicable statute of limitations is four years for causes of action based on unwritten contracts or fraud, as well as for breach of contract related to the sale of goods.[1] *See* N.M. Stat. Ann. §§ 37-1-4 and 55-2-725(1). Finally, there is no dispute that the four-year limitations period applies to all of Brown's claims.

Brown alleges that he made his last gold purchase from Defendants sometime in 2013, and that he did not file his complaint in this case until July of 2019. Therefore, it is undisputed that more than four years passed between Brown's last purchase and the filing of his complaint, and that his claims are untimely unless he can show that the limitations period should be tolled. To this end, Brown relies upon New Mexico's "discovery rule" to toll the limitations period. He argues

---

[1] The parties do not dispute that gold coins and bullion constitute "goods" within the meaning of the Uniform Commercial Code, N.M. Stat. Ann. § 55-2-105(1).

that he justifiably relied upon Defendants' misrepresentations about the amount of premium he was paying, and therefore he had no duty to investigate their truth until he actually did so.

"The date from which the statute of limitations begins to run may be extended by New Mexico's discovery rule, under which a 'cause of action does not accrue until the plaintiff discovers' the injury." *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1210 (10th Cir. 2013) (quoting *Wilde v. Westland Dev. Co.*, 2010-NMCA-085, ¶ 18, 241 P.3d 628, 635) (applying discovery rule to claims of conspiracy and breach of contract); *see* N.M. Stat. Ann. § 37-1-7 (1880). Under the discovery rule, the statute of limitations begins to run "when the plaintiff acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action"; this is referred to as "inquiry notice." *Yurcic v. City of Gallup*, 2013-NMCA-039, ¶ 9, 298 P.3d 500, 503 (internal quotation marks omitted); *see also Gerke v. Romero*, 2010-NMCA-060, ¶ 10, 237 P.3d 111, 115. The question is whether the plaintiff possesses knowledge that "'would, on reasonable diligent investigation, lead to knowledge of'" the injury. *Wilde*, 2010-NMCA-085, ¶ 18, 241 P.3d at 635 (quoting *Ambassador E. Apts., Inv'rs v. Ambassador E. Invs.*, 1987-NMCA-135, ¶ 7, 746 P.2d 163, 165). Actual knowledge is not required. *Rhinehart v. Nowlin*, 1990-NMCA-136, ¶ 39, 805 P.2d 88, 97. "Whatever puts a party upon inquiry is sufficient 'notice' and the party has a duty to inquire or he will be chargeable with all the facts." *Id.*; *see Yurcic*, 2013-NMCA-039, ¶ 9, 298 P.3d at 504.

"When a defendant makes a prima facie showing that a claim is time barred, a plaintiff attempting to invoke the discovery rule has the burden of 'demonstrat[ing] that if [he or] she had diligently investigated the problem [he or] she would have been unable to discover' the facts underlying the claim." *Butler v. Deutsche Morgan Grenfell, Inc.*, 2006-NMCA-084, ¶ 28, 140 P.3d 532, 539 (involving motion to dismiss); *see Yurcic*, 2013-NMCA-039, ¶¶ 28-30, 298 P.3d at 508-

09 (discussing shifting burdens of proof). The party invoking the discovery rule has the burden of demonstrating that he lacked knowledge of the cause of action and, even if he had diligently investigated, he could not have discovered the problem or the cause of injury. *Martinez v. Showa Denko, K.K.*, 1998-NMCA-111, ¶ 22, 964 P.2d 176, 181 (involving summary judgment motion); *McNeill v. Rice Eng'g & Operating Inc.*, 2006-NMCA-015, ¶ 40, 128 P.3d 476, 486 (addressing plaintiffs' burden in opposing summary judgment motion).

Applying the reasoning of the decisions above to the facts of this case as alleged by Brown, the Court concludes that Brown has not pled sufficient facts to support the discovery rule and his claims are barred by the statute of limitations. Here, it appears that all the information that Brown needed in order to determine the amount of his premiums was available to him throughout his business relationship with Defendants. Brown alleges that the invoices sent by Defendants to Brown set forth how many coins Brown had purchased and at what price. He also alleges that with this information and through his own independent "research," he was able to calculate the amount of premiums he paid for each transaction. Finally, the Court takes notice that the daily spot price of gold (as well as historical data of the same) is publicly available information.

In this case, Brown first acquired actual knowledge of his injury in April or May of 2016, when he did his initial research and determined he had paid a premium larger than 6-9% on one specific transaction. However, under *Rhinehart*, 805 P.2d at 97, actual knowledge is not required. Rather, *Butler* instructs us that the burden is on Brown to demonstrate that even if he had diligently investigated the problem—i.e., the amount of his premiums—he would not have been able to discover that he was paying more than the agreed amount. 140 P.3d at 539. *See also Martinez,* 964 P.2d at 181. Brown's own allegations demonstrate that he was able to calculate his premiums on his own with the information routinely provided by Defendants and other information that he

8

obtained independently. Thus, he has failed to plead facts supporting the application of the discovery rule.

The older New Mexico Court of Appeals case upon which Brown relies, *Gaston v. Hartzell*, 1976-NMCA-041, 549 P.2d 632, does not aid his argument. First, the reasoning in *Gaston* has been superseded by subsequent rulings by the New Mexico Court of Appeals described above, which place the burden on Brown to plead facts showing that if he had diligently investigated the problem he would have been unable to discover the facts underlying the claim. As previously discussed, the facts pled by Brown demonstrate the opposite. Second, the facts of *Gaston* are distinguishable. In that case, the sellers of a house misrepresented the square footage of the property, asserting that it was larger than it actually was. Four years later when the buyers went to sell the property, an appraiser informed them of the true square footage. The buyers in *Gaston* could not have discovered the misrepresentation through their own diligent investigation; rather, they could discover it only through the services of a professional appraiser. In this way, *Gaston* is factually very different from this case.

Brown asks for leave to amend his complaint to remedy the defects leading to dismissal. *See* Doc. 12 at 12. However, he offers no insight as to the types of facts that he could allege in an amended complaint that would change the outcome of this ruling. Indeed, with regard to the discovery rule it is difficult to see what facts he could allege in an amended pleading that would not contradict the facts he has alleged in his original complaint. Thus, on the record before it the Court must conclude that any amended pleading would be futile, and therefore the request for leave to amend will be denied.

Finally, having concluded that Brown's claims are time-barred, the Court will not reach the other grounds for dismissal raised by Defendants.

**IT IS THEREFORE ORDERED** that *Defendants' Motion to Dismiss* [Doc. 2] is **GRANTED**, and Plaintiff's claims are **DISMISSED**.

_____
**UNITED STATES DISTRICT JUDGE**